UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 19-cr-10068-IT |
| | ) | |
| HOWARD JOHN | ) | |

**DEFENDANT'S EMERGENCY MOTION FOR A DETENTION HEARING**

Defendant Howard John, who has not previously had a detention hearing, moves this Court, pursuant to 18 U.S.C. § 3142(f), for an expedited hearing to consider conditions of release. The matter is made more urgent due to his medical vulnerability in the face of the COVID-19 pandemic.

I.   Procedural History

On February 5, 2019, Mr. John made his initial appearance before this Court on a complaint charging him as a felon in possession of a firearm and ammunition. At the time, he was in state custody on the same matter and had been brought before the Court by writ.

On March 3, 2019, Mr. John was arraigned in this Court on a single count indictment charging that on November 10, 2018, in Somerville, he possessed a firearm and ammunition having previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).

On January 8, 2020, a rule 11 hearing was scheduled and commenced, but not completed. Counsel were ordered by the Court to report as to any differences between the present case and a just returned opinion of the First Circuit in United States v. Moran, COA docket # 18-1876P.

On January 17, 2020, defendant by counsel filed his response to the Court's order, indicating that he would not proceed with his plea and would proceed to file a motion to suppress evidence.

On February 21, 2020, defendant filed his Motion to Suppress with Supporting Authorities.

On March 13, 2020, the government filed its Opposition to Motion to Suppress. On April 2, 2020, the Court ordered defendant to reply to the government's opposition.

Further proceedings are pending, subject to the uncertainties in scheduling caused by the ongoing pandemic.

Mr. John has been in custody since his arrest on November 10, 2018.

## II. The Charged Conduct and Applicable Guideline

On November 10, 2018, Somerville Police arrived at the residence of Mr. John's girlfriend on a domestic disturbance call. According to the police report, Mr. John "came to the door with a wound that was bleeding to the hand." Police asked him "to step outside of the residence into the hallway" and the officer "called for medical to check out Mr. John's hand." As police related in the police report: "it was discovered that a fight had broken out inside the house and at some point a knife was produced by [defendant's girlfriend]. During this fight both [defendant's son] and Mr. John received cuts on their hands." Id., at 11. Police officers spoke with defendant's girlfriend who stated that Mr. John had arrived at approximately 11:30pm to gather some of his belongings. He had gone into the bedroom and pulled out a black suitcase from underneath an armoire which she had never seen before. Police sought the consent of the girlfriend to search the suitcase and found the lower receiver of a rifle, along with rounds of ammunition. They then went to Mr. John's car and found, after towing it to the station and searching it, the upper receiver of the same firearm.

In the aftermath of the arrest, Mr. John was charged in state court, inter alia, with unlawful possession of a firearm and assault and battery on a household member. The charges were nolle prossed on February 5, 2019. His girlfriend sought a restraining order at the time, which lapsed on May 3, 2019.

If convicted, the possible guideline would be a base level 14 (as a prohibited person with no past crimes of violence,[1] plus 2 points if the firearm was a stolen weapon, less 3 points (acceptance of responsibility), so 13 points in Criminal History Category II, so a range of 15-21 months.

### III.  Mr. John's Custody and Medical Condition

Mr. John has been in custody over 17 months so he is already in a "time served" range. He is currently detained at MCI Cedar Junction. He suffers from life-long asthma, first diagnosed when he was 3-4 years old. Appended to this motion are accounts by his mother and first cousin relating to his history of asthma. See Exhibits A and B. He describes its effects, when exacerbated, as making him feel as if he were drowning.  He relates that he had been twice taken to the emergency room at Somerville Hospital, in 2016 and in 2017, in both instances due to acute asthma attacks.

Health records from Walpole indicate that he suffers from chronic respiratory asthma, characterized by the health units at Walpole as "Mild intermittent asthma with (acute) exacerbation." See Exhibit C (as redacted). An exacerbation is an episode of progressively worsening shortness of breath, cough, wheezing, and/or chest tightness characterized by decreases in expiratory airflow. See Anne Fuhlbrigge, MD, et al., "Asthma Outcomes: Exacerbations," Journal Allergy Clin. Immunol. (March 13, 2013). The treatment goal is to reduce the risk of exacerbations through treatment with systemic use of corticosteroids and use of short-acting β-agonists, sometimes referred to as "rescue" medications. This is the course of

---

[1] Defendant has a 2002 conviction in South Carolina for the offense of "assault and battery of a high and aggravated nature" (ABHAN). The offense is not a crime of violence. See *United States v. Montes-Flores*, 736 F.3d 357, 369 (4th Cir. 2013) ("Because ABHAN can be committed with or without force -- and even when force is involved, ABHAN can be committed in a violent or nonviolent manner -- a conviction for ABHAN is not categorically a crime of violence. Accordingly, Appellant's sentence must be vacated and this case remanded for resentencing.")

treatment that Mr. John follows at Walpole. He is prescribed and uses an inhaler on the unit, and is treated both with a corticosteroid and with a rescue inhaler.

Asthma is one of several health conditions identified by the Center for Disease Control as elevating a person's risk for severe complications if they contract COVID-19.[2] The CDC advises those with moderate to severe asthma that "[t]he best way to prevent illness is to avoid being exposed to this virus" and recommends strategies like maintaining social distance, avoiding the ill as well as crowds, observing good personal hygiene in terms of regular hand washing and disinfection with alcohol-based hand sanitizer, and avoiding sharing items like flatware, cups, and towels and linens. None of these is options realistically available to Mr. John while detained.

At Cedar Junction, he is in a unit with 26 other detainees. He has no mask nor do the other detainees. Corrections officers have been given masks but do not use them regularly. Detainees are daily permitted only 40 minutes outside the cell. Showers are cleaned at the end of the day, not between uses. Food is cooked and delivered by officers who rotate kitchen duty at the single kitchen in the institution. As a result, there is considerable circulation by persons throughout the institution. There is no temperature checking for detainees. Officers are subject to checks but, he is told, the effort is lax. Canteen is provided by outside contractors who pass through each unit to deliver items.

Because of his diagnosis, a co-morbid condition that greatly increases the harm caused by the coronavirus, Mr. John is particularly vulnerable. Continued detention seriously jeopardizes his health and his life.

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html

IV.  Risks of COVID-19 Generally and to Prison and Jail Populations

As of April 1, 2020, COVID-19 had infected over 877,422 people worldwide, leading to at least 43,537 deaths worldwide and 189,633 confirmed cases in the United States.[3] Less than two weeks later, as of April 13, 2020 there were more than 1,870,076 reported COVID-19 cases worldwide and more than 22,146 deaths in the United States.[4] As of April 20, 2020, the numbers had grown with 2,216,228 infected, with at least 166,235 deaths worldwide. Projections range from 100,000 to 200,000 deaths in the United States in the best case scenario, to as many as 1.5 million deaths in the most severe scenario.[5]

The Centers for Disease Control and Prevention ("CDC") has issued guidance discouraging gatherings of more than 10 people in one place.[6] It also urges social distancing—every person should remain at a distance of at least six feet from every other person.[7] Proper

---

[3] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (Mar. 27, 2020), available at at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6. (Last accessed April 1, 2020 at 9:23 A.M.). *See also* World Health Organization, Cornoavirus disease 2019 (COVID-19) Situation Report – 62 (Mar. 21, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200322-sitrep-62-covid-19.pdf?sfvrsn=f7764c46_2

[4] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited Apr. 13, 2020). These numbers rise significantly every day.

[5] See *Dr. Deborah Birx Predicts Up To 200,000 Deaths "If We Do Things Almost Perfectly"* NBC News, Mar. 30, 2020 https://www.nbcnews.com/news/us-news/dr-deborah-birx-predicts-200-000-deaths-if-we-do-n1171876 ; Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, New York Times (Mar. 13, 2020) https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html

[6] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[7] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-

hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended. On April 3, 2020, the CDC issued new guidance recommending the general public to "wear[] cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) *especially* in areas of significant community-based transmission."[8]

Leaders across the globe have mobilized to drastically limit the physical interaction of people and the spread of the virus. For example, in Massachusetts, Governor Charlie Baker has enacted emergency orders[9] to close all schools, prohibit on-site consumption of food and beverages, and restrict visitor access to nursing homes. On March 23, 2020, Governor Baker ordered all non-essential businesses to close and directed the Department of Public Health to issue a stay-at-home advisory. That advisory has been extended at least until May 4, 2020.[10] Rhode Island Governor Gina Raimondo similarly issued a stay-at-home order on March 28, 2020, and banned gatherings of more than five people in any public or private space.[11] That order has been extended at least until May 8, 2020.[12]

---

sociistancing-and-self-quarantine.

[8] CDC, "Recommendations for Cloth Face Covers" (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[9] Office of Governor Charlie Baker, "COVID-19 State of Emergency" (last accessed Apr. 17, 2020), https://www.mass.gov/info-details/covid-19-state-of-emergency.

[10] The Hill, "Massachusetts Governor Extends Stay-At-Home Advisory Through May 4" (Mar. 31, 2020), https://thehill.com/homenews/state-watch/490426-massachusetts-governor-extends-stay-at-home-advisory-through-may-4.

[11] WGBH News, "Rhode Island Governor Issues Strick Stay-At-Home Order" (Mar. 28, 2020), https://www.wgbh.org/news/local-news/2020/03/28/rhode-island-governor-issues-strict-stay-at-home-order.

[12] 7 News, "RI Stay-At-Home Orders Extended to May 8; Providence Parks Closed" (Apr. 7, 2020), https://whdh.com/news/ri-stay-at-home-orders-extended-to-may-8-providence-parks-closed/.

All of these precautionary measures are designed specifically to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is so highly contagious. However, the measures necessary to mitigating the spread of COVID-19 are unavailable to incarcerated people or those who must interact with them. The large, confined populations at jails make them no better than a cruise ship[13] or a nursing home[14] – places where the virus has run rampant. Due to close quarters and common spaces, and minimal provisions for healthcare and hygiene, jails are tinderboxes in which the COVID-19 virus can spread, jeopardizing the life and safety of inmates.[15] The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated inmates or those who must interact with them. In prison, people are confined in close proximity to one another and to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater. In addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill equipped.

The Bureau of Prisons is reporting positive COVID-19 cases among staff and inmates at a shocking rate. The rate of increase of infected people has surpassed the national rate by an

---

[13] CDC, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[14] Los Angeles Times, "Seattle-Area Nursing Home Deaths Jump to 13 with COVID-19 and 11 of Unknown Causes" (Mar. 7, 2020), https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

[15] Medical professionals behind bars are sounding the alarm. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can."). *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020).

enormous degree, as reflected in the following graphic:[16]



As of April 20, 2020, the BOP has reported **22 federal inmate deaths**, and 495 federal inmates and 309 BOP staff members who have tested positive for COVID-19.[17] The BOP's reported numbers of positive tests are almost certainly lower than the actual number of inmates

---

[16] Graph created by the Federal Defenders of New York, available at https://federaldefendersny.org/.

[17] Federal Bureau of Prisons, COVID-19 (last accessed Apr. 20, 2020), https://www.bop.gov/coronavirus/index.jsp (numbers include those who have recovered after testing positive).

and staff members who have become infected. This is because the BOP has not instituted mass testing for the coronavirus, and tests remain scarce. For example, the federal penitentiary in Terre Haute, Indiana, which houses between 2,500 and 3,000 inmates, received only four tests as of late March.[18] At the federal prison in Oakdale, Louisiana, where at least seven inmates have died and dozens have tested positive, "correctional officers were told to stop testing people and just assume that anyone with symptoms had been infected[.]"[19] The director of the CDC has reported, however, that as many as 25% of people infected with the coronavirus may not show any symptoms.[20] To illustrate this point: After an inmate tested positive at an Arkansas state prison around April 11, 2020, the corrections department tested all the other inmates housed in that unit. "The state corrections department announced that a whopping 43 of the 46 other men in the housing unit had tested positive. They were all asymptomatic and are now quarantined."[21]

Other state prisons that have widely tested their populations have reported astronomical rates of infection. The New York Times reported on April 8, 2020[22] that the Cook County Jail in Chicago is the largest known source of infections in the United States:

> At least 353 cases can be linked to the jail — more than have been connected to the U.S.S. Theodore Roosevelt; a nursing home in Kirkland, Wash.; or the cluster centered in New Rochelle, N.Y.
>
> The Cook County Sheriff's Office, which operates the jail, said 238 inmates and 115 staff members had tested positive as of Wednesday.

---

[18] Mother Jones, "Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas" (Apr. 13, 2020), https://www.motherjones.com/coronavirus-updates/2020/04/cummins-unit-prison-arkansas-coronavirus-spread/.

[19] *Id.*

[20] NY Times, "Infected But Feeling Fine: The Unwitting Coronavirus Spreaders" (Apr. 1, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[21] *See supra* n.22.

[22] NY Times, "A Jail in Chicago is Now the Largest-Known Source of U.S. Infections" (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-live-updates.html?action=click&module=Spotlight&pgtype=Homepage#link-7634e187.

Additionally, on Rikers Island in New York, more than 700 people have have tested positive, including over 440 staff members. One inmate, who was being held on a technical parole violation, died at the jail. In addition, at least six correctional officers have died.[23] The most significant difference between the BOP facilities and these state prisons is in the number of people who have been tested.

The conditions at MCI Cedar Junction, where Mr. John is housed, are not materially different from the conditions of Rikers or Cook County Jail. Inmates are still sharing common areas, eating meals while sitting shoulder-to-shoulder. Moreover, correctional institutions are slow to address health problems in the best of circumstances. Records from facility inspections conducted at MCI Cedar Junction on December 11, 12, and 13, 2019 by the Commonwealth's Environmental Health and Safety Office showed 198 repeat violations, according to the Executive Office of Health and Human Services, Dep't of Public Health, Bureau of Environmental Health, Community Sanitation Program, Facility Inspection - MCI Cedar Junction, Walpole (Dec. 20, 2019), see https://www.mass.gov/doc/mci-cedar-junction-december-11-2019/download.

Courts in this District have recognized the dire risk of detention during the pandemic and have released pretrial detainees to mitigate their risk of severe illness or death.

In *United States v. Xavier Niles-Charles*, dkt no. 1901MJ07444-JCB, Magistrate Judge Boal released defendant with the government's assent. Mr. Niles-Charles faced firearms charges including a mandatory minimum charge of possession of a firearm in furtherance of a drug trafficking crime, pursuant to 18 U.S.C. § 924(c). According to the medical record filed in the case, the defendant had "mild intermittent asthma, uncomplicated," in contrast here with Mr.

---

[23] Newsweek, "More than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff" (Apr. 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

John's diagnosis of "mild intermittent asthma with (acute) exacerbation," with its characteristics of progressively worsening shortness of breath and decreases in expiratory airflow.

On April 14, 2020, Magistrate Judge Kelley granted a pretrial detainee's motion for reconsideration of her detention order, allowing temporary release to home confinement for 60 days. *See United States v. Greenan*, No. 1:19-cr-10327, Dkt. No. 44 (D. Mass. April 14, 2020). Unlike Mr. John here, the defendant had no underlying medical conditions. She was charged with wire fraud and filing false tax returns for allegedly embezzling money while working as a bookkeeper. Upon her recent motion for reconsideration of the earlier detention order, Magistrate-Judge Kelley granted temporary release over the government's objection, recognizing that the jail was not set up to deal with the highly contagious coronavirus.

V. <u>The Bail Reform Act Empowers This Court To Release Mr. John During this Pandemic.</u>

As an initial matter, the Bail Reform Act requires that a detention hearing "shall be held immediately upon the person's first appearance before the judicial officer," here when he first came into federal custody. 18 U.S.C. § 3142(f). Next, in considering release, a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). The Act calls attention to the presumption of innocence. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."); *see generally Stack v. Boyle*, 342 U.S. 1, 4 (1951). It follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake)

(citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

Courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As one court recognized, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly." *United States v. Scarpa*, 815 F.Supp. 88, 93 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). Thus, even in cases where there is a rebuttable presumption of danger to the community, release may be appropriate to safeguard a defendant's health and life. *See, e.g*, *id*.; *see also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146 (D.P.R. 2002) (defendant charged with assaulting and attempting to kill federal agent released to custody of his relatives because "[n]otwithstanding the defendant's apparent dangerousness in this case, his present condition is indeed grave and can deteriorate if not carefully treated. At present, the Bureau of Prisons cannot provide the necessary medical care defendant requires.").

This Court should consider the "total harm and benefits to prisoner and society" that the continued pretrial imprisonment of Mr. John would yield, relative to the heightened health risks posed to him during this rapidly encroaching pandemic. *See generally*, *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016) (in sentencing context, observing that a trial judge "cannot close his or her eyes to the conditions a particular defendant . . . will necessarily experience in prison"); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

Indeed, even in instances (unlike here) where a court has already ordered a person detained, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for the

preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). *See, e.g., United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant). *see also United States v. Birbragher*, No. 07-cr-1023-(LRR), 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008) (describing *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993), and *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002), as cases in which courts found "compelling reason" to temporarily release defendants due to the defendants' serious medical issues).

The Bail Reform Act requires the Court to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

As matters stand, Mr. John has not yet had a detention hearing. He has been in custody for approximately 17 months, so he is already in a "time served" range, see, supra at 3, and will likely overserve any guideline sentence if he remains in custody while his case is adjudicated. He proposes to live in a residence in Somerville, living in a room in an apartment with roommates. He submits that home confinement strikes the appropriate balance in protecting his health and the safety of the public during the COVID-19 crisis.

## CONCLUSION

For the foregoing reasons, Mr. John respectfully moves this Court as follows:

A.     Hold an emergency detention hearing as soon as possible;

B.     Allow Mr. John to appear by video; and

C.     Release Mr. John on home confinement, a $10,000 unsecured bond, and such additional conditions that the Court deems necessary.

Respectfully submitted,

HOWARD JOHN

By his Attorney,

*/s/ Jessica Thrall*
Jessica Thrall,
 B.B.O.: 670412
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA   02210
Tel: 617-223-8061

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 28, 2020.

*/s/ Charles McGinty*
Charles McGinty