UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 1:19-cr-10068-IT |
| | * | |
| HOWARD JOHN, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

February 1, 2021

TALWANI, D.J.

    Defendant Howard John is charged with being a felon in possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). Indictment [#7]. He seeks an order suppressing the firearm seized from a case in his girlfriend's apartment on the ground that there was no valid consent for the warrantless search of the case. He also seeks to suppress evidence uncovered in the subsequent vehicle search, database query, and second residential search, and Defendant's custodial statement as the fruit of an unlawful search. For the reasons that follow, Defendant's Motion to Suppress [#47] is DENIED.

I.    Factual Record Underlying the Motion

    At approximately 12:15 a.m. on November 10, 2018, Somerville Police Officers Sousa, Ramirez, and Cleary responded to a domestic disturbance report at 3 Wesley Park, Apartment #202. Somerville Police Department Incident Report #18066722[1] ("Incident Rep.") 2 [#52-1]; Affidavit of Officer Jose Ramirez ("Ramirez Aff.") 1 [#49-2]. Officer Sousa knocked on the

---

[1] The Incident Report includes narrative accounts from Officer Sousa, Lieutenant deOliveira, Officer Cleary, Officer Ramirez, and Detective Monaco.

door, heard a male voice coming from inside the apartment, but received no response. Affidavit of Officer Tyler Sousa ("Sousa Aff.") ¶ 3 [#49-1]. He observed blood on the door and the floor. Id. at ¶ 3; Incident Rep. 2 [#52-1]. He knocked again, announced himself as Somerville Police, and heard a male voice ask him to "hold on." Sousa Aff. ¶ 3 [#49-1]. He knocked harder and said that the officers needed "to get in right away." Id. at ¶ 3; Incident Rep. 2 [#52-1]. Approximately one minute later, Defendant, whom Officer Sousa and Officer Ramirez knew from a previous encounter, came to the door with a bleeding hand wound. Sousa Aff. ¶ 3 [#49-1]; Ramirez Aff. ¶ 3 [#49-2]; Incident Rep. 2 [#52-1]. Defendant stepped into the hallway at Officer Sousa's request. Sousa Aff. ¶ 3 [#49-1]; Incident Rep. 2 [#52-1].

Officers Sousa and Cleary remained in the hallway with Defendant and called for medical assistance while Officer Ramirez went inside the apartment. Sousa Aff. ¶ 3 [#49-1]; Ramirez Aff. ¶ 3 [#49-2]; Incident Rep. 2 [#52-1]. Shortly thereafter, Officer Ramirez signaled to his colleagues to handcuff Defendant, which they did. Sousa Aff. ¶ 4 [#49-1]; Incident Rep. 2 [#52-1]. Officer Ramirez then reported that a child in the apartment had told him that Defendant had a gun "on his back."[2] Sousa Aff. ¶ 4 [#49-1]; Ramirez Aff. ¶ 4 [#49-2]; see also Incident Rep. 13 [#52-1]. The officers frisked Defendant but found no weapon. Sousa Aff. ¶ 4 [#49-1]; Incident Rep. 3 [#52-1].

Officer Ramirez also informed the other officers that "he had learned that" Defendant had assaulted his girlfriend, Nichelle Brison, who remained inside the apartment. Sousa Aff. ¶ 4 [#49-1]; Ramirez Aff. ¶ 4 [#49-2]; Incident Rep. 3 [#52-1]. The officers arrested Defendant for

---

[2] Officer Ramirez's affidavit and incident report do not mention that he signaled to the other officers to handcuff Defendant, only that he informed them that the child stated Defendant had a gun after which Officers Cleary and Sousa frisked Defendant for firearms. Ramirez Aff. 2 [#49-2]; Incident Rep. 12-13 [#52-1].

Domestic Assault and Battery. Sousa Aff. ¶ 4 [#49-1]; Incident Rep. 3 [#52-1]. He was transported to the police station.[3] Incident Rep. 3 [#52-1]. Around this time, Lieutenant deOliveira and others arrived to assist. Id. at 9.

Officer Sousa entered the apartment and spoke with Ms. Brison. Sousa Aff. ¶ 5 [#49-1]; Incident Rep. 3 [#52-1]. She told him that Defendant had arrived at approximately 11:30 p.m. to "gather some of his belongings," among them a black "case"[4] she had never seen before, which he pulled from underneath an armoire. Sousa Aff. ¶ 5 [#49-1]; Incident Rep. 3 [#52-1]. Defendant and Ms. Brison argued over Defendant's unannounced visit to the apartment because "he did not live there anymore." Sousa Aff. ¶ 5 [#49-1]; Incident Rep. 3 [#49-1]. Ms. Brison reported that he then slapped and choked her until their six-year-old son "interceded" and they stopped fighting. Sousa Aff. ¶ 5 [#49-1]; Incident Rep. 3 [#49-1]. She indicated that Defendant then removed several bags from the apartment, including a black backpack,[5] Sousa Aff. ¶¶ 5, 9

---

[3] The exact time of Defendant's departure from the scene is unclear. The Incident Report includes accounts from several officers. Officer Sousa indicates that Defendant was handcuffed, searched, arrested, and transported to the station in close succession. Incident Rep. 3 [#52-1]. Lieutenant deOliveira's report indicates that Defendant remained on scene long enough to respond to a question about whether he possessed a license to carry a firearm. Id. at 9 [#52-1]. Officer Cleary's account indicates that Defendant remained on the scene long enough to be seen by EMS but also that "shortly after" he was handcuffed and searched he was transported to Somerville Police Headquarters. Id. at 11-12 [#52-1]. Officer Ramirez's account also indicates that Defendant was tended to by Somerville fire fighters prior to being "placed under arrest and transported to Police HQ." Id. at 13 [#52-1].

[4] This item appears to be variously referred to as a "case," Sousa Aff. ¶ 5 [#49-1], a "suitcase," Incident Rep. 3 [#52-1]; Voluntary Statement Form [#47-2], "laptop case," Incident Rep. 13 [#52-1], "bag," Voluntary Statement Form [#47-2], and "briefcase." Incident Rep. 9 [#52-1]. The court refers to it as a "case."

[5] Officer Sousa states that the officers "also had information that John had taken a backpack to his vehicle which was parked outside." Sousa Aff. ¶ 9 [#49-1]. He does not specify where that information came from, though it is implied that Ms. Brison told him. Lieutenant deOliveira, the Patrol Supervisor at the time, reports that Defendant's girlfriend told Officer Sousa that Defendant had "removed a backpack from the apartment and brought it to his vehicle." Incident Rep. 10 [#52-1].

3

[#49-1]; Incident Rep. 3 [#52-2]. Her six-year-old son told Officer Sousa that he had seen a gun with something yellow on it in Defendant's black backpack. Sousa Aff. ¶ 5 [#49-1]; Incident Rep. 3 [#52-1].

Ms. Brison stated that, when Defendant returned to the apartment after removing the bags, she grabbed her phone to call the police at which point Defendant hit the phone out of her hand and punched her in the face. Incident Rep. 3 [#52-1]; Sousa Aff. ¶ 6 [#49-1]. Ms. Brison stated that she then "grabbed a knife to defend herself," and during the struggle Defendant and Ms. Brison's son were each cut while grabbing the knife. Sousa Aff. ¶ 6 [#49-1]; Incident Rep. 3 [#52-1]. The fight ended with a neighbor's knock on the door, and the police arrived shortly after. Incident Rep. 3 [#52-1].

After speaking with Officer Sousa, Ms. Brison signed a typewritten form authorizing Lieutenant deOliveira and Officer Ramirez to make "a complete search of the above described apartment," where the officers' names and the word "apartment" are hand-written into blank spaces. Consent to Search Form [#47-1] (filed with redactions). Officer Sousa reports that Ms. Brison "asked us to locate and remove any firearms in the apartment because of her concern for the safety of her young son and her own safety." Sousa Aff. ¶ 7 [#49-1].[6] The case from under

---

[6] Officer Sousa does not mention this comment in his incident report. Incident Rep. 2-5 [#52-1]. Lieutenant DeOliveira, in his incident report, states:

> Officer Ramirez informed me that a young child in the apartment spontaneously said that he saw Mr. John with a gun in his hands while inside the apartment. We asked Ms. Brison if she owned any firearms, to which she said "no". We asked her if there was a firearm in the apartment, *to which she said that if there was Mr. John had it, and it could be in a black briefcase that Mr. John had with him during the argument.* We asked Mr. John if he possessed a license to carry a firearm, to which he said "no". *Ms. Brison gave us consent to search her apartment. She told us that if there was a firearm in the apartment, she wanted it removed for her safety and the safety of her young son.*

Id. at 9 (emphasis added).

4

the armoire was discovered on the kitchen table, which was near the front door. See Incident Rep. 4, 9-10 [#52-1]. Officer Ramirez, Officer Cleary, and Lieutenant DeOliveira opened the case, described as "a black 'Targus' briefcase," and discovered the lower receiver of an AR-15 along with ammunition and three rifle scopes. Incident Rep. 9-10 [#52-1]. Officer Ramirez observed "what appeared to be fresh blood" on the case. Ramirez Aff. ¶ 6 [#49-1]; see also Incident Rep. 13 [#52-1]. On a "Voluntary Statement Form," Ms. Brison recounted:

> Police saw a black suitcase while responding to a domestic call at my house. The bag does not belong to me. I gave police permission to search the bag. I have never seen this bag until tonight when he pulled (Howard John) it from under the furniture in the bedroom while we were arguing.

Voluntary Statement Form [#47-2].[7]

Officers then turned their attention to Defendant's car, which was parked on the street in front of the apartment building. Incident Rep. 10 [#52-1]. Lieutenant deOliveira explains in his incident report narrative that "[b]ecause we only located the lower receiver of the rifle . . . coupled with the fact that Mr. John had just removed a backpack from the apartment, and placed it in his vehicle, we believed that there was probable cause to believe that the rest of the rifle could be inside Mr. John's vehicle," which was "parked on a public way and could be driven away." Id. at 10. Officer Sousa noted that the child had told the police that the black backpack contained a gun. Id. at 4; Sousa Aff. ¶ 9 [#49-1]. Lieutenant deOliveira "authorized a search of the vehicle in an attempt to locate the rest of the rifle." Incident Rep. 10 [#52-1]. However, due to "heavy rain" and "poor lighting," he had the car towed to the police station where he and Officers Sousa, Ramirez, and Cleary conducted the search. Id. at 10. In the trunk, Officer Sousa

---

[7] There is no dispute that the "suitcase" or "bag" referenced in the Voluntary Statement Form [#47-2] is the case found on the kitchen table.

found a black backpack containing a yellow glove and the upper receiver and barrel of an AR-15 rifle. Id. at 4, 10, 12.

The Officer in Charge that evening queried the serial number of the rifle and learned it had been reported stolen, along with other firearms, by the Kittery, Maine Police Department on May 24, 2018. Id. at 10-11. Officer Cleary and Sergeant Fusco received a call from the Kittery Police Department and a report regarding the firearms burglary which indicated other stolen weapons remained missing. Id. at 5. Officer Cleary and Sergeant Fusco returned to the apartment to perform "a second consent search of the premises approved by Ms. Brison." Id. at 5. During this second search they found some loose 9mm ammunition but no additional firearms. Id. at 5.

On the evening of November 11, 2018, Defendant, who remained in custody, requested an interview, signed a Rosario waiver of his right to be arraigned without unreasonable delay and a Miranda form, and made a recorded statement to Detectives Monaco and Thermidor. Id. at 13.

II.   Legal Standard

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). "To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)). This inquiry involves a two-part test: "first, whether the defendant had an actual, subjective,

expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as objectively reasonable." Id. at 48-49 (citation and quotation omitted).

A defendant may have a legally sufficient interest in places other than his own home, such as a home where he is an invited overnight guest. See Olson, 495 U.S. at 98-100. However, a defendant does not have a legitimate expectation of privacy in a place where he lacks permission to be present. Battle, 637 F.3d at 49 (collecting cases).

III. Analysis

Defendant argues that Ms. Brison had no common authority over the case and was thus legally unable to consent to its search. Defendant's Motion to Suppress ("Def.'s Mtn.") 5-6 [#47]. Further, he contends there was insufficient information to support probable cause for the subsequent search of his vehicle. Id. at 7. Defendant argues both that he had an actual expectation of privacy in the case and that his expectation was reasonable because he had previously lived in the apartment and had kept the case private. Defendant's Post-Hearing Memorandum ("Def's. Post-Hearing Memo.") 2-8 [#80].

The government does not directly address the issue of third party consent, but rather argues first that Defendant does not have standing to assert a Fourth Amendment claim and, in the alternative, that the search was justified by exigency, the emergency aid exception, and the plain view doctrine. Opposition to Motion to Suppress ("Opp'n") 1-2 [#49]. Finally, the government argues that the evidence found during the search of the case should not be excluded because it would have inevitably been discovered. Id.

    A. Defendant's Standing

The government argues that Defendant has failed to meet his burden of establishing that he had a reasonable expectation of privacy. Opp'n 5-6 [#49] (citing United States v. Stokes, 829

F.3d 47, 51 (1st Cir. 2016) and United States v. Rodriguez-Lozada, 558 F.3d 29, 37 (1st Cir. 2009)).

"The 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy.'"[8] Stokes, 829 F.3d at 51 (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). It is a defendant's burden to make "a threshold showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized.'" Id. (quoting United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)). "[T]his threshold inquiry is 'more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" Battle, 637 F.3d at 47 n.1 (quoting Rakas, 439 U.S. at 140).

Defendant does not claim an expectation of privacy in Ms. Brison's apartment, and in any event, any such expectation would not be objectively reasonable. Not only did Defendant no longer reside there, but he was not welcome there, as Ms. Brison told him when he arrived the first time that night and assaulted her, and as further evidenced by Ms. Brison's call to 911 when Defendant returned to her apartment without permission for the second time that night. Incident Rep. 7 [#52-1].

---

[8] The First Circuit has

> often catalogued the sort of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such. If the movant satisfies us on this score, we then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances.

United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988) (internal citations omitted).

Defendant does claim an expectation of privacy in the black case he stored in Ms. Brison's apartment. Defendant's Reply ("Def's. Reply") 3 [#61] ("The record shows that Mr. John had a subjective expectation of privacy in his laptop bag."). The First Circuit recognizes that "a person generally has an expectation of privacy in items he places in a closed container" unless the container "so betray[s] [its] contents as to abrogate any such expectation." United States v. Meada, 408 F.3d 14, 23 (1st Cir. 2005); see also United States v. Infante-Ruiz, 13 F.3d 498, 501-02 (1st Cir. 1994). Indeed, in United States v. Moran, the First Circuit found that the defendant, who claimed no expectation of privacy in his sister's storage unit generally, nonetheless had a reasonable expectation of privacy in opaque black trash bags he was keeping there. 944 F.3d 1, 5 n.2 (1st Cir. 2019).

Here Defendant had a subjective expectation of privacy in the black case. He kept it hidden from view under the armoire and Ms. Brison was unaware of its existence until the night of the assault and search.[9] Incident Rep. 7 [#52-1]; Def's. Reply 3 [#61]. In other words, Defendant "thought of the [case] . . . as [ ] private . . . and treated it as such." Aguirre, 839 F.2d at 857. Defendant urges the court to find that, as in Moran, his subjective expectation of privacy in his case was reasonable. Def's. Reply 4 [#61]. In its Sur-reply [#78], the government argues that this matter is distinguishable from Moran because here Defendant stored the case in Ms.

---

[9] Defendant lists the following facts as "salient" to his subjective expectation of privacy in the case:

> (1) Mr. John lived in the apartment, at least in the recent past, and his young son continued to live there; (2) he came to the apartment to gather his possessions; (3) he retrieved the laptop bag from the bedroom as one of several belongings to take with him; (4) his other belongings had remained in the apartment, and Ms. Brison had not disposed of them; (5) Mr. John placed the bag close to the front door of the apartment; (6) he did so as he was in the process of taking some bags out of the apartment and into his vehicle; and (7) he returned to the apartment to retrieve the laptop bag that he left close to the door.

Def's. Post-Hearing Memo. 2-3 [#80].

Case 1:19-cr-10068-IT   Document 82   Filed 02/01/21   Page 10 of 13

Brison's apartment (and was present in that apartment) without her consent. Gov'ts Sur-reply ("Sur-reply") 3 [#78].

Defendant does not dispute that he was in the apartment without Ms. Brison's consent. Defendant claims that his expectation of privacy in the case was still reasonable "because the process of moving could not be accomplished all at once." Def's. Post-Hearing Memo. 4 [#80]. But as the government points out, Defendant has presented no evidence as to: what possessory rights Defendant had to the apartment; when Defendant was last living in the apartment; and what the prior living arrangements were and how those arrangements ended. Government's Reply to Post-Hearing Memorandum ("Reply to Post-Hearing Memo.") 1 [#81]; see also Sur-reply 3 [#78].

In the absence of evidence as to when Defendant stopped living at Ms. Brison's apartment and when Ms. Brison revoked his permission to be there, the court is left with the fact that on the night in question, Defendant lacked permission to be in the apartment. Sousa Aff. 2 [#49-1].

This court finds the privacy interest Defendant claims in the case is not objectively reasonable because his presence in the apartment at or near the time of the search was not legitimate. United States v. Lnu, 544 F.3d 361, 365-66 (1st Cir. 2008). Defendant entered an apartment he had no permission to be in and assaulted the apartment's occupant. Sousa Aff. 2-3 [#49-1]. Even if Defendant "subjectively did not intend to abandon" his case, his expectation that he retained a privacy interest in it at the time of the search was "objectively unreasonable and does not allow the [D]efendant to challenge the search on Fourth Amendment grounds." Id. at 367.

10

The court finds the First Circuit's reasoning in Battle conclusive. 637 F.3d 44. Like Defendant, the defendant in Battle had been told "to leave [the] apartment and not come back." Id. at 49. Also, like Defendant, Mr. Battle claimed that because he still had personal items in the apartment and because he was only kicked out of the apartment 12 days prior, his expectation of privacy remained legitimate. Id. at 48-49. The First Circuit acknowledged his subjective expectation but explained that it was not reasonable and was not one "that society is prepared to recognize." Id. at 49.

Defendant argues that Battle is distinguishable because while 12 days elapsed between when Mr. Battle's former romantic partner kicked him out and the search, here Defendant was only kicked out shortly before the search. Def's. Post-Hearing Memo. 5 [#80]. The court is unconvinced. There is an insufficient record to show when Defendant stopped living in the apartment, but when he returned to Ms. Brison's apartment that night he was not a "welcomed guest." Battle, 637 F.3d at 49; see also United States v. McCarthy, 77 F.3d 522, 528 (1st Cir. 1996) (defendant had no reasonable expectation of privacy in open suitcase after he was told he had to leave the trailer). Although Defendant argues to the contrary, he provides no authority for the proposition that a person retains a privacy expectation in something left behind in a place they are no longer permitted to be. Def's. Reply 4 [#61] (citing Moran, 944 F.3d at 3-4 (defendant's sister gave him permission to keep his opaque bags in her storage unit); United States v. Mancini, 8 F.3d 104, 110 (1st Cir. 1993) (defendant-mayor had permission to be in the town's archive attic where he placed his files)).

The fact the case was a closed container makes this a closer call than Battle where the gun was found beneath the couch. 637 F.3d at 47. However, at the heart of the inquiry is whether Defendant's expectation was reasonable in light of the circumstances and the court finds that it

11

was not. The court notes that other circuits draw a clear line even when dealing with closed containers and find that once a defendant has lost his right to access a space, "he has no legitimate expectation of privacy" in things left behind. United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987); United States v. Sawyer, 929 F.3d 497, 500 (7th Cir. 2019) ("A privacy interest is not reasonable when one's presence in a place is wrongful.") (citation omitted); United States v. Struckman, 603 F.3d 731, 747 (9th Cir. 2010) (trespassers cannot claim the protections of the Fourth Amendment); United States v. Hunyady, 409 F.3d 297, 303 (6th Cir. 2005) (trespasser who had a tenuous connection with otherwise empty house had no legitimate expectation of privacy to contest its search). As the First Circuit has noted, "the right to access the area searched in an important fact" in analyzing a person's reasonable expectation of privacy. Lnu, 544 F.3d at 366, (citing Rawlings v. Kentucky, 448 U.S. 98, 105 (1980)).[10]

Defendant's Fourth Amendment challenge fails because he lacks a "legitimate expectation of privacy to assert it." Battle, 637 F.3d at 48. Consequently, because Defendant lacks standing to object under the Fourth Amendment, this Court does not address the government's arguments concerning various exceptions to the warrant requirement. Opp'n. 6-13 [#49]; Sur-reply 5-9 [#78]; Reply to Post-Hearing Memo. 4-7 [#81].

### B. Automobile Search and Defendant's Statements

Turning to the search of Defendant's car, Defendant argues that if the search of the case fails, "the core component of the claimed probable cause [for the search of the car] evaporates."

---

[10] That any expectation of privacy by Defendant was not reasonable is underscored by Ms. Brison's right to protect herself and her young son and request that the police remove any weapons from her apartment. Had the police simply removed the case in response to that request, they would have been entitled to search it before moving it. United States v. Richardson, 515 F.3d 74, 85 (1st Cir. 2008) ("The Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy."); see also United States v. Hawkins, 279 F.3d 83, 85-86 (1st Cir. 2002) (noting written policy not required).

Def's. Mtn. 7 [#47]; see also Def's. Reply 13 [#61]. Defendant's argument rests on the claim that without finding the lower receiver of the rifle, police would have had an insufficient basis for probable cause. Def's. Mtn. 7 [#47]. The government argues that if Defendant lacks standing to challenge the search of the case his "motion fails as to all the evidence seized." Opp'n 5 n.1 [#49].

Finding an insufficient basis to suppress evidence from the case, the court also denies Defendant's requests to suppress the evidence uncovered in the car, the subsequent search of the apartment, the database query, and Defendant's custodial statement.

IV. Conclusion

Accordingly, for the aforementioned reasons, Defendant's Motion to Suppress [#47] is DENIED.

IT IS SO ORDERED.

Date: February 1, 2021                    /s/ Indira Talwani
                                          United States District Judge